

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-24-00860-CV

**IN THE INTEREST OF E.M.V.** and G.R.R, Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2023-PA-01828
Honorable Lisa Jarrett, Judge Presiding

Opinion by:    Lori Massey Brissette, Justice

Sitting:        Lori I. Valenzuela Justice
                Lori Massey Brissette, Justice
                Adrian A. Spears II, Justice

Delivered and Filed: April 30, 2025

AFFIRMED

This case involves the termination of a mother's right to parent her two children who, at the time of the final hearing, were four years old and two years old.[1] Mother appeals the trial court's order terminating her parental rights, challenging the sufficiency of the evidence supporting the trial court's finding that termination is in the best interests of the children. We affirm the trial court's order.

---

[1] We will refer to the children individually as "oldest child" and "youngest child" to protect the identity of the children. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

## PROCEDURAL FACTS

The Department of Family and Protective Services filed an Original Petition for Protection of Child, for Conservatorship, and for Termination in Suit Affecting Parent Child Relationship on December 19, 2023. Soon after, the Department was granted temporary conservatorship. Mother was presented with and signed a family service plan which indicated her understanding of the requirements set forth therein and the ramifications for her failure to complete them. A status hearing was held on February 12, 2024. Mother was referred to the Early Childhood Court program and then, from there, referred to the Family Drug Court program. On April 9, 2024, she was expelled from the Family Drug Court program. A permanency hearing was held in June and in October of 2024. On November 4, 2024, a final trial was held. After hearing the testimony of five witnesses, including the removing caseworker, the legal caseworker, the Family Drug Court monitor, the children's current caregiver, and Mother's recovery coach, the trial court terminated Mother's parent rights based on Texas Family Code subsections 161.001(b)(1)(N), (O), and (P) and found termination was in the best interest of the children as required by Texas Family Code section 161.001(b)(2). *See* TEX. FAM. CODE § 161.001(b). The court granted permanent managing conservatorship to the children's current caregiver, their godfather, under section 153.132 of the Texas Family Code, finding that the appointment of a parent as managing conservator would not be in the best interests of the children. On appeal, Mother challenges only the finding that termination of her rights is in the best interests of the children.

## BACKGROUND FACTS

**Removal**

At the time of removal, the oldest child had just turned four years of age and the youngest child was fourteen months old. The Department received numerous referrals for neglectful

supervision, domestic violence, and drug use by Mother.[2] At the time of removal, Mother had gotten kicked out of Haven for Hope and was homeless. Both children were living with their godfather (I.G.). While Mother denied drug use, she tested positive for both methamphetamines and amphetamines.[3]

At first, Mother was not cooperative. She was referred to the Early Childhood Court program which rejected her case. She was then referred to the Family Drug Court program which began working with her and she was placed at Alpha Home.[4] In less than two months, Mother—who had by then become pregnant again—was expelled from the Family Drug Court because she left Alpha Home and either refused to take drug tests or tested positive when she did.[5] She also left a second drug treatment center and submitted to only two out of ten drug test requests, with both results positive.

The Department provided Mother a family service plan, which became an order of the court.[6] Mother was ordered to obtain employment and stable housing, complete mental health services, specifically a psychological and psychosocial assessment as well as individual counseling, attend parenting classes, attend domestic violence classes, complete a substance abuse assessment and follow all recommendations, and engage in random drug testing. Mother completed both the psychological and psychosocial assessments, but did not make any meaningful

---

[2] Specifically, Mother was found throwing rocks at Father while the children were present. She also failed to pick the children up from daycare, requiring the daycare to call law enforcement.

[3] Father was incarcerated soon after removal and remained incarcerated during the entire proceeding. He does not challenge the termination of his parental rights.

[4] Family Drug Court provides intensive support services to assist parents to achieve and maintain sobriety with the goal of attaining reunification with the children sooner than through the normal CPS docket.

[5] A third child was born on August 27, 2024 and was also removed by the Department due to Mother's drug usage.

[6] The legal caseworker testified that Mother was made aware of the requirements and signed the family service plan, indicating that she understood that the failure to engage in services could result in the termination of her parental rights.

progress on the other aspects of her family service plan until September 2024, just five weeks before the trial of this matter, when she was ordered by the felony drug court in a separate criminal proceeding to return to Haven for Hope and participate in the Pay It Forward program, a fully monitored drug treatment program. In the five weeks prior to trial, Mother maintained sobriety and started participating in counseling as well as parenting and domestic violence classes.[7] Mother has documented, serious mental health needs and is finally addressing them through the Pay It Forward program, including being stabilized on medication. While her recovery coach could not guarantee her success, she stated Mother's plan would be to finish the Pay It Forward program and then move into a sober living home until February 2026 before she would be ready to reunify with the children.

Mother attended only half of the scheduled visits with the children during the proceeding, seven of those when she was in a rehab program. The Department testified that the children were visibly impacted by Mother's failure to show up at visits, becoming hurt and confused. But when they are together, the caseworker testified they are loving to each other.

The children have been with their godfather, I.G., throughout the pendency of the proceeding; in fact, they've been with him on and off since they were babies.[8] The oldest child calls him his "second dad" and both children are very bonded with I.G. Neither are on any medication and neither have special needs. According to the Department, both are doing well in I.G.'s care, as I.G. provides consistency and stability, takes them to church, and meets their every need. Notably, I.G. had been working towards getting licensed as a foster parent when Mother

---

[7] The testimony at trial established that when Mother is in a program, she tends to engage. But, she has been unsuccessfully discharged from the Family Drug Court program and two drug treatment centers. While engaged in the Pay It Forward program, Mother knows that she will be incarcerated if she does not complete the program.

[8] Mother chose I.G. to be the children's godfather.

made allegations about him, just months before the final trial, which now preclude him getting licensed.[9] Even so, the Department testified that it is the children's best interests for I.G. to become their permanent managing conservator and he agreed to do so for all three children, to ensure the siblings could stay together.

**BEST INTERESTS OF THE CHILDREN**

Mother argues the evidence was legally and factually insufficient to support the trial court's finding that it is in the best interests of the children to terminate her parental rights. We disagree.

**Standard of Review**

It is of constitutional importance when a trial court involuntarily terminates a natural parent's rights. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied). But those rights "are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A parent-child relationship may be terminated, pursuant to Texas Family Code section 161.001, only if the trial court finds by clear and convincing evidence one predicate ground enumerated in subsection (b)(1) and termination is in a child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *see, e.g.*, *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

An appellate court reviewing the legal sufficiency of the evidence cannot apply "our traditional legal sufficiency standard, which upholds a finding supported by '[a]nything more than

---

[9] Notably, no testimony was offered by anyone, including Mother, about the specific allegations made. It is evident from the record that all treated the allegations as an attempt by Mother to regain custody over I.G.

a scintilla of evidence.'" *In re J.F.C.*, 96 S.W.3d 256, 264–65 (Tex. 2002) (quoting *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). This "is inadequate" under the United States Constitution, which demands evidence be "clear and convincing"; nor would it afford the protections of that higher standard of proof. *Id.* at 265 ("Requiring only '[a]nything more than' a mere scintilla of evidence does not equate to clear and convincing evidence.") (quoting *Formosa Plastics,* 960 S.W.2d at 48) (alteration in original)). Our legal sufficiency review, therefore, must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266; *see C.E.*, 687 S.W.3d at 308 (stating same, citing *J.F.C.*). This means we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. We are also required to "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* But we do not disregard undisputed facts that do not support the finding as this would distort our legal sufficiency review. *Id.*

The difference between our legal and factual sufficiency reviews when the burden of proof is clear and convincing evidence is small, "but there is a distinction in how the evidence is reviewed." *Id.* at 266. For factual sufficiency, we place an even keener eye on the evidence contrary to the finding, determining whether "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*; *see, e.g.*, *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (same, quoting *J.F.C.*).

**Applicable Law**

Under Texas law, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a trial court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27–29.

The Texas legislature codified certain factors to use in determining the best interest of a child, including:

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)     the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)     whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A)     minimally adequate health and nutritional care;

(B)     care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C)     guidance and supervision consistent with the child's safety;

(D)     a safe physical home environment;

(E)     protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F)     an understanding of the child's needs and capabilities; and

(13)     whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307(b); *see In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018) (recognizing statutory factors as additional factors for consideration). Even before the legislature took action to codify section 263.307(b), the Texas Supreme Court, in *Holley v. Adams*, identified factors to determine the best interest of a child:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

544 S.W.2d 367, 371–72 (Tex. 1976).

The Department does not have to prove every factor for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. In our review of the trial court's best-interest findings, we must consider "the totality of the circumstances" in light of these factors to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.). Additionally, "[a] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

**ANALYSIS**

**The Children's Needs and Desires**

When children are too young to express their desires like the children here, the factfinder may consider whether the child has bonded with caregivers, is well-cared for by them, and has spent minimal time with a parent. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL 650450, at *6 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.). The testimony offered by the Department and by the godfather of the children established that the children love their Mother and that Mother is bonded with the children. But, it also established that Mother's failure to consistently meet the needs of the children had a visible impact on them. The youngest child was characterized as quiet during visits, which is allegedly unlike her normal personality. The oldest child, it was stated, became hurt and confused because of missed visits and had a hard time adjusting once visits resumed. Both children are bonded with I.G., turn to him when they are hurt,

and are clearly responding to the stable nature of his care. I.G. has engaged the youngest child in speech therapy and, as a result, her vocabulary is flourishing. The oldest child has also been receiving counseling for an adjustment disorder and past trauma and is doing well. I.G. is meeting their medical, dental, educational and emotional needs and, notably, has been doing so since long before the Department removed the children from Mother's care.

On the other hand, the testimony established that Mother is unable to meet the needs of the children, whether that be emotional needs for consistency and stability, or the physical need of housing. In fact, in the ten months that this proceeding was pending in the trial court, Mother lived on the streets, in Haven for Hope, Alpha Home, Salvation Army shelter, and SAMM Ministries.

Like every child, these children need a clean, safe place to live, and they need someone to take care of their personal hygiene. The evidence demonstrated that both children, in the care of Mother, were not having those needs met and, even further, that Mother was unable to meet them. The caseworker testified that, until just a few weeks prior to trial, Mother failed to recognize her role in neglecting her children—whether that was failing to pick them up from day care or failing to engage in scheduled visits—and failed to take accountability for her mental health needs and substance abuse. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72 (factors (C)–(D)).

**The Emotional and Physical Danger to the Children and Circumstances of Removal**

Thankfully, the children are in good shape because they've been cared for by their godfather, even before the Department removed them from Mother. But, regretfully, while there is evidence that she loves her children, there is no evidence that Mother actively contributed to their well-being. *See* FAM. CODE § 263.307(b) (2), (3), and (4); *Holley*, 544 S.W.2d at 371–72 (factors (A)–(C)).

**Mother's Condition and Parental Abilities**

Mother finally began addressing her mental health issues, her substance abuse, her anger issues, and her parenting skills in the few weeks prior to trial, after failing to engage from December 2023 to September 2024. In fact, she repeatedly failed to admit she had a drug problem, even while she was testing positive while pregnant with her third child. The testimony established that she is successful in the Pay It Forward program because of the rigorous nature of the monitored program and the threat that she will be incarcerated if she does not comply. It was further established that she would not be in a position to demonstrate her ability to care for the children again until February 2026.

Given that Mother has not been able to establish stable housing or employment and was in the beginning of a drug treatment program at the time of trial, the caseworker testified that she did not believe Mother was capable of providing a safe, stable environment or of meeting the needs of the children. *See* TEX. FAM. CODE § 263.307(b)(6), (10)–(12); *Holley*, 544 S.W.2d at 371–72 (factor (G)). The parent-child visits, and her failure to attend half of them, further demonstrated that Mother was not cognizant of a need to interact with and meet the needs of her children, even for short increments of time. *See* TEX. FAM. CODE § 263.307(b)(11)–(12); *Holley*, 544 S.W.2d at 371–72 (factors (C) and (D)).

**Quality of New Placements**

Here, the children are in the care of I.G., their godfather who has been involved in their care—at the request of both Mother and Father—since they were babies. The Department testified that I.G. is a solid, stable presence for the children, establishing regular bath time, nap time, church time, and more. By all accounts, the children are thriving in I.G.'s home. And, despite Mother's attempt to thwart his ability to provide ongoing care for the children, he's willing to take on

permanent managing conservatorship with no help from the Department. He's even taken in the third child, born during this proceeding, so that the siblings could remain together in one home. *See Holley,* 544 S.W.2d at 371–72 (factors (D)–(G)).

**Summary**

Here, applying our standard of review for legal sufficiency and viewing the evidence in a light favorable to the trial court's findings, and given that we can only go on the conduct of the Mother to date, we conclude the trial court could have reasonably formed a firm belief or conviction termination of Mother's parental rights was in the best interest of her children. *See In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re J.O.H.*, 617 S.W.3d 596, 599 (Tex. App.—San Antonio 2020, no pet.) (holding that, in considering child's best interest, parent's future conduct may be judged by past conduct). Turning to factual sufficiency, we further conclude that when viewing the entire record, any evidence contrary to the finding is not so significant that it would prevent a reasonable factfinder from forming the same firm belief or conviction termination was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266; TEX. FAM. CODE § 161.001(b)(2).

## CONCLUSION

For those reasons, we affirm the trial court's order.

Lori Massey Brissette, Justice

- 12 -